IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MONIQUE FOSTER,                    *

      Plaintiff,                  *

      v.                          *          Civil Action No. 8:19-cv-1199-PX

SUMMER VILLAGE COMMUNITY            *
ASSOCIATION, INC., *et al.*,
                          *

      Defendants.

                           ***

## MEMORANDUM OPINION

Pending in this employment discrimination case is the motion for summary judgment filed by Defendants Summer Village Community Association, Inc., and Summer Village Condominium No. One, Inc. ("Summer Village" or "Defendants").  ECF No. 18.  Plaintiff, Monique Foster ("Foster") has responded, and no hearing is necessary.  *See* Loc. R. 105.6.  For the following reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  ECF No. 18.

### I.        Background

As a preliminary matter, the Court must address the haphazard and, at times, illogical broadside attack that Foster lodges against the record evidence submitted in support of Defendants' summary judgment motion.  ECF No. 19 at 1; ECF No. 19-21.  Although Foster lobs single-sentence objections to practically each record submitted, she also *relies on fourteen of the same exhibits* as evidence in her response.  She attempts to square this circle by maintaining that she concedes "admissibility" only to the extent *she* relies on the evidence.  ECF No. 19 at 1.  Foster cannot have it all ways.

Foster's position is made less tenable when considering that the lion's share of the

challenged exhibits are indeed admissible as business records, *see, e.g.*, ECF Nos. 18-10 & 18-22, or represent admissions or other statements subject to exceptions under the hearsay rule, *see, e.g.*, ECF Nos. 18-19 & 18-24.  Summer Village has also demonstrated that it is capable of establishing authenticity at trial.  *See* ECF No. 21-1; Fed. R. Civ. P. 56(c).  This is all that is required here.  *See Sall v. Wells Fargo Bank, N.A.*, No. DKC-10-2245, 2012 WL 5463027, at *1 n.1 (D. Md. Nov. 7, 2012); *Ridgell v. Astrue*, No. DKC-10-3280, 2012 WL 707008, at *9 (D. Md. Mar. 2, 2012).  The following record evidence is construed in the light most favorable to Foster.

Foster, a black woman, began working for Summer Village as a temporary employee in August 5, 2013.  ECF No. 19-17 at 5.  On October 11, 2013, Summer Village's Office Manager, Charice Young ("Young"), also a black female, extended Foster the full-time position as service coordinator after receiving approval from General Manager Ruth Gunn ("Gunn"), a white female.  *Id.*; ECF No. 19-8; ECF No. 20 at 1.

In Foster's first few months working in the front office, Foster observed Gunn cycle through four temporary employees, all black women, and then ultimately settle on a white female for the full-time front-desk position.  ECF No. 20 at 1–2.  So, following Young's advice, Foster reported only to Young.  *Id.* at 1; ECF No. 19-17 at 8.  After Young left in early 2015, Foster reported to Riva Proctor ("Proctor"), the facilities manager, and to Gunn.  ECF No. 19-17 at 10; ECF No. 19-12 at 1.

### A.    Timecard Policy and First Two Written Warnings

When Foster began working full time in 2013, she received Summer Village's personnel policy handbook.  ECF No. 19-17 at 9.  The handbook directs that employees "must punch in and out on the time clock."  ECF No. 19-9 at 11.  The handbook required punching in upon

arrival every morning, out for lunch, and out at the end of the day.  *Id.*   The handbook also provided that if an employee missed a punch, any manually entered time must be "initialed by a manager before payment for those hours worked can be made."  *Id.*

Foster concedes that she did not always use the timeclock.  ECF No. 18-22; ECF No. 19-17 at 23.  In February and June of 2014, Young reminded all staff, including Foster, that they were required to comply with the timecard policy.  ECF No. 19-17 at 8, 23-24; ECF No. 18-14; ECF No. 18-15.  On July 28, 2014, Young issued Foster her first written warning through a Corrective Action Form ("CAF") stemming from Foster's noncompliance.  ECF No. 19-10; *see also* ECF No. 19-17 at 21.  According to the CAF, Foster was "not punching in and out as required by the … handbook."  ECF No. 19-10 at 1.  The CAF directed Foster "to punch in upon approval, punch out for lunch, punch back in when lunch is completed, and then punch out for the day."  *Id.*  Foster signed the CAF and was placed on a 30-day probationary period.  *Id.*

The next day, Foster received a second CAF.  ECF No. 18-17.  This CAF stated that on July 28, Foster left work early without explanation, arrived late the next morning, and was observed making personal phone calls during work hours.  *Id.*  In response to the timecard allegations, Foster insisted that she was "never properly trained on how to use a timeclock."  *Id.* at 2.  Young provided Foster with a "timecard punch demonstration" that same day.  *Id.* at 1; ECF 19-17 at 21.

## B.    Racially Insensitive Comments at Work

Several months later, in February 2015, Susan McDonald ("McDonald"), a white Summer Village employee, transferred from the grounds crew to a position in the front office. ECF No. 20 at 2.  At the time, Foster worked in the front office with Bernadette Thomas ("Thomas"), also a black woman.  *Id.*  McDonald told Gunn in earshot of Foster, "it's nice to

join the office monkeys." *Id.* Gunn laughed in response, added "yeah join the office monkeys," and gestured at Foster and Swanson. *Id.* Also around the same time, Foster overheard Gunn tell her black coworker to stop exhibiting "ghetto" behavior. *Id.* at 3. On another occasion, Foster overheard Gunn having a phone conversation in her office where Gunn said, "they're uneducated" and "they steal," in reference to the custodial and maintenance staff, all of whom were nonwhite. *Id.*

### C.    Foster's Performance Evaluations

In January 2015, Foster asked Gunn to conduct performance evaluations for the staff, but Gunn did not respond. *Id.* at 2-3. Foster next turned to Summer Village's Board of Directors in March 2015. *Id.*; ECF No. 19-19 at 1. Foster informed the Board that, in her view, the office staff lacked "professionalism, fairness, and organization," and complained that she had never received a performance evaluation. ECF No. 19-19 at 1.

In response, the Board instructed Gunn and Proctor to conduct job evaluations. Foster received hers on March 23, 2015 and was less than pleased with it. ECF No. 19-17 at 10-11; ECF No. 19-11. On a scale of one to five, Foster received a 2.76, which fell into the "unsatisfactory" range. ECF No. 19-7 at 11. From Foster's perspective, the evaluation was "not true" and failed to account for the additional work she performed beyond her assigned duties. *Id.* After Gunn had become "combative" in her evaluation, Foster reached out again to the Board for assistance and submitted her objections to the evaluation in writing to Gunn and Proctor. ECF No. 20 at 4; ECF No. 19-11.  In her objections, Foster described the office's disorganization, and noted that she had remained professional despite being called an "office monkey" and withstood Gunn's comments about her coworker's behavior as "ghetto." ECF No. 19-11 at 1. Foster also noted that her timecard "rarely reflects [her] actual time in the office," meaning that

she often worked in excess of the hours claimed, but that she would "work on" compliance with the timecard policy.  *Id.* at 2.

Foster received a follow-up evaluation on May 22, 2015.  ECF No. 19-17 at 11, 28. Based on the additional work Foster was performing, Gunn and Proctor adjusted Foster's overall score from 2.76 to a 3, which translated into a "satisfactory" rating.  *Id.* at 27-28.  Gunn also increased Foster's salary from $15 to $17 an hour, implemented retroactively as of December 2014.  *Id.*; ECF No. 18-20; ECF No. 18-21.  The evaluation, however, still laid out various areas for improvement for Foster, including that Foster "clock in and out at the beginning and end of the shifts."  ECF No. 19-12 at 5.  Foster signed this evaluation but disagreed with Gunn and Proctor's criticism.  ECF No. 19-12.

### D.    Continued Issues With Punching the Timecard

In June and July 2015, Foster wrote her time in manually about as often as she used the timeclock.  ECF No. 18-22 at 6-9.  Foster, however, maintains that when she brought her questions or concerns about her timecard to Gunn during this period, Gunn told her, "don't worry about it," or "just write in your time."  ECF No. 19-17 at 9-10, 14; ECF No. 20 at 4.

Despite contemporaneously approving Foster's manual time entries, Gunn issued Foster two CAFs on July 16, 2015, one for violating the timecard policy.  ECF No. 19-14 & ECF No. 19-15.  According to Gunn, she issued this CAF after she examined Foster's timecard one week in July and noticed that as of Thursday morning, time entries were missing for Monday, Tuesday, and Wednesday of that week.  ECF No 18-8 at 11-13; ECF No. 18-22 at 9.  This, in Gunn's view, was a clear violation of the policy.  *Id.*  The CAF placed Foster on a 90-day probationary period and stated that "failure to maintain an accurate time record … [may] result in termination."  ECF No. 19-14.

Gunn issued a second CAF that same day after a resident complained that Foster had given her apartment keys to an outside contractor to inspect the premises without advance notice or permission. ECF No. 19-13; ECF No. 18-8 at 9; ECF No. 19-15. Foster insists she did not give the keys to the contractor and had nothing to do with this incident. ECF No. 20 at 4.

Foster viewed these CAFs as Gunn's latest attempt to "sabotage" her, and so she refused to sign either CAF. *Id.*; ECF No. 18-8 at 4. Gunn took Foster's refusal as both a "flagrant" disregard of the timecard policy and a sign that Foster would not improve her performance. *Id.* Thus, even though Gunn had just placed Foster on a 90-day probationary period, Gunn decided "it was time to call an end to this." *Id.*

### E.       Foster's Illness, EEOC Complaint, and Termination

On July 22, 2015, Foster advised Gunn that she would be out that morning for a doctor's appointment. ECF No. 19-17 at 15. At that appointment, Foster was diagnosed with strep throat. *Id.* Foster surmised that her coworker had transmitted the infection to her. *Id.* She left her appointment "upset." *Id.* After her appointment, Foster went to the U.S. Equal Employment Opportunity Commission ("EEOC") and filed a complaint. *Id.* at 15, 17.

On her way to file the complaint, Foster called her two of her coworkers to report that she wanted "some type of resolution" because her "reaching out to the [Summer Village] board" was no longer helping. *Id.* at 16. Foster also called Gunn to let her know that she had strep throat and would be out for several days. *Id.* at 15. Foster filed her Complaint with the EEOC on the same day. *Id.* at 17. The EEOC issued a notice of dismissal and right-to-sue letter on July 31, 2015. ECF No. 18-28.

Gunn drafted Foster's termination letter on July 22, 2015. ECF No. 19-16. When Foster returned to work on July 25, she was called into Gunn's office and fired. ECF No. 19-17 at 17.

6

Although the termination letter itself did not state the grounds for Summer Village taking this action (ECF No. 19-16), other records contemporaneously document that Foster was terminated for failing to "improve issues" raised at her performance review.  ECF No. 18-27.

## F.   Second EEOC Complaint

Foster filed a second complaint with the EEOC in September 2015 which was transferred to the Montgomery County Office of Human Rights ("MCOHR") in January 2016.  ECF No. 19-4.  Summer Village received notice of the complaint the following month.  *Id.*  After investigation, MCOHR concluded that "reasonable grounds" supported the retaliation claim, but not the race discrimination claim.  ECF No. 19-5 at 20.  Foster appealed the MCOHR's finding as to the racial discrimination claim, which MCOHR affirmed.  ECF No. 18-5 at 2.  MCOHR then referred Foster's retaliation claim to the Office of Zoning and Administrative Hearings ("OZAH") for a public hearing and recommendation.  ECF No. 19-5.  OZAH conducted a hearing on April 20, 2018, closed the record on May 21, 2018, and issued a decision on July 2, 2018, finding that Foster had not established by a preponderance of the evidence that Summer Village retaliated against her.  ECF No. 19-6 at 4.  MCOHR affirmed OZAH's decision on September 18, 2018.  ECF No. 18-7.

Foster did not appeal the MCOHR's findings and instead filed suit against Summer Village in the Circuit Court of Montgomery County, alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 1981 ("Section 1981"); the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't §§ 20-601, *et seq.*; and Chapter 27-19 of the Montgomery County Code. ECF No. 6.  Summer Village noted removal on April 24, 2019 and answered the Complaint. ECF Nos. 1 & 3.  With discovery complete, Summer Village now moves for summary judgment

on all claims.  ECF No. 18.

## II.        Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc*., 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co*., 381 F.2d 245, 249 (4th Cir. 1967)).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted.  *Celotex*, 477 U.S. at 322.  With this standard, the Court addresses the sufficiency of each of Foster's claims.

## III.       Discriminatory Discharge

Foster brings her claims of racial discrimination under Title VII, Section 1981, MFEPA,

and Montgomery County Code.[1]  Title VII prohibits an employer from "discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's race," among other protected characteristics.  42 U.S.C. § 2000e–2(a)(1).  Section 1981, MFEPA, and county law also prohibit such conduct, and claims brought under those statutes are assessed under the Title VII framework.  *See Guessous v. Fairview Prop. Invs., LLC*, 828 F 3d. 208, 216 (4th Cir. 2016); *Brennan v. Deluxe Corp*., 361 F. Supp. 3d 494, 498 n.2 (D. Md. 2019); *Idris v. Ratner Co./Creative Hairdressers*, No. TDC-14-1425, 2014 WL 5382633, at *3 (D. Md. Oct. 21, 2014) (citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 504 (2007)); *Dyer v. Oracle Corp.*, No. PWG-16-521, 2016 WL 7048943, at *2 n.5 (D. Md. Dec. 5, 2016).  This Court will therefore analyze Foster's discrimination claims under federal, state, and county law together. *See Whittaker v. David's Beautiful People, Inc.*, No. DKC-14-2483, 2016 WL 429963, at *2 n.2 (D. Md. Feb. 4, 2016).

## A.   Methods of Proof in Title VII Cases

In Title VII cases, a plaintiff may pursue two avenues, or methods of proof, to demonstrate that she suffered intentional employment discrimination: (1) the mixed motive framework or (2) the pretext framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513, 520 (4th Cir. 2006); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (quotation omitted); *Hartman v. Univ. of Md.*, No. ELH–10–2041, 2012 WL 3544730, at *12 (D. Md. Aug. 14, 2012) (citation omitted).  Under the "mixed motive" framework, a plaintiff can establish a claim of racial discrimination by showing that her race was a motivating factor in her employer's decision

---

[1] State law provides a cause of action for violating Montgomery County Code § 27-19.  *See* Md Code. Ann., State Gov't § 20-1202.

to fire her, "even though it was not the sole motivating factor." *Warch*, 435 F.3d at 520 (citation omitted). To avoid summary judgment under this framework, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (quotation omitted); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–100 (2003).

Under the second framework, the plaintiff must "carry the initial burden under the statute of establishing a prima facie case" of discrimination. *McDonnell Douglas*, 411 U.S. at 802. "Although the precise formulation of the required prima facie showing will vary in 'different factual situations,' the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, 'under circumstances which give rise to an inference of unlawful discrimination.'" *Hartman*, 2012 WL 3544730, at *13 (quoting *McDonnell Douglas*, 411 U.S. at 802 n.13; *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Provided a plaintiff makes out her prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for her discharge. *See Burdine*, 450 U.S. at 253 (quotation omitted); *Guessous*, 828 F.3d at 216–17. If the employer provides such a reason, the burden shifts back to the plaintiff to raise a genuine dispute as to whether the proffered reason is mere pretext for discrimination. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001) (quotation omitted).

Under either framework, the plaintiff always "bears the ultimate burden of persuading the court that [she] has been the victim of intentional discrimination," *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (quotation omitted), "regardless of the type of evidence offered by [her in] support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive [i.e. pretext]

framework," *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (quotation omitted), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

In attempting to defeat summary judgment, Plaintiff urges that sufficient evidence permits her to proceed under either the mixed-motive or *McDonnell Douglas* framework. ECF No. 19 at 7-13. However, to survive summary judgment, Foster need only present a genuine issue of material fact as to one liability theory. *See EEOC v. Dimensions Healthcare System*, No. PX-15-2342, 2016 WL 4593470, at *3 (D. Md. Sept. 2, 2016). Because Foster has met her burden at this stage under the *McDonnell Douglas*, the Court need not reach whether Foster's discrimination claims would *also* survive a mixed-motive analysis.[2]

### B.    *McDonnell Douglas* **Framework**

To proceed under this framework, a plaintiff must generally establish a prima facie case of discriminatory termination "by demonstrating that (1) she is a member of a protected group; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside of the protected class." *Witherspoon v. Brennan*, 449 F. Supp. 3d 491, 500 (D. Md. 2020) (quoting *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007)).

If Foster establishes a prima facie case of discrimination, the burden shifts to Summer

---

[2] Because Gunn's remarks are sufficiently vile and disturbing to defeat summary judgment as to intentional discrimination under *McDonnell Douglas*, the Court reserves judgment as to whether at trial, if Foster pursues a mixed-motive theory, such remarks are sufficient direct or circumstantial evidence of discrimination in connection with the decision to fire Foster so as to warrant a mixed-motive instruction. *See Warch*, 435 F.3d at 520; *Desert Palace*, 539 U.S. at 99–101; *EEOC v. Warfield-Rohr Casket Co., Inc.*, 364 F.3d 160, 163 n.1 (4th Cir. 2004); *see also Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1232, 1241-42 (11th Cir. 2016) (explaining plaintiff must generate sufficient evidence for mixed-motive instruction that employer relied on a protected characteristic in its decision).

Village to offer a legitimate, non-discriminatory reason for her discharge.  *See Guessous*, 828 F.3d at 216–17.  Summer Village "need only articulate 'reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action.'"  *Moore v. Mukasey*, 305 F. App'x 111, 115 (4th Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)) (emphasis in *Hicks*); *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).  Once Summer Village offers such a reason, the burden then shifts back to Foster to raise a genuine dispute as to whether Summer Village's proffered reason is mere pretext for discrimination.  *See Sears Roebuck*, 243 F.3d at 852.

Summer Village first asserts that Foster cannot establish the third and fourth prongs of the prima facie case.  ECF No. 18-1 at 15-16.  Summer Village also argues in the alternative that even if Foster can make out a prima facie case, she has not generated sufficient evidence of pretext.  *Id.* at 18.  The Court takes each argument in turn.

As to the third prong of the prima facie case, whether Foster was meeting the legitimate expectations of Summer Village, the plaintiff's burden at this stage is "not onerous."  *Hartman*, 2012 WL 3544730, at *15 (quoting *Warch*, 435 F.3d at 515).  The Fourth Circuit has cautioned against applying this element "too strictly," else courts run the risk of "premature[ly] dismiss[ing] potentially meritorious claims."  *Warch*, 453 F.3d at 516 (quotation omitted).  It is undeniably plaintiff's burden at the prima facie stage.  But the goal is to "sharpen[] the inquiry into the elusive factual question of intentional discrimination."  *Id.* at 517 (quotation omitted).

Here, Foster has met her burden.  The evidence supports that just two months before her termination, Foster received a satisfactory performance evaluation and pay raise because she was taking on additional responsibilities that were outside her job description.  ECF No. 19-17 at 27-

28; ECF No. 18-21.  These facts are persuasive evidence that Foster was, from Summer Village's perspective, performing her job satisfactorily.  *See Hartman*, 2012 WL 3544730, at *15 (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)).

Summer Village now insists that Foster's timekeeping practices fell short of its legitimate expectations.  This position, however, is belied by the fact that Summer Village was content to look past these supposed shortcomings and award Foster a pay-raise just weeks before she was fired.  ECF No. 18-20; ECF No. 18-21; ECF No. 18-26.  Equally important, the record reflects a discrepancy between the guidance she received on paper (in her performance evaluation) and what Gunn authorized in person.  ECF No. 19-17 at 9–10, 14, 28.  According to Foster, whenever she raised questions with Gunn about her timecard, Gunn told her "don't worry" and "just write your time in."  ECF No. 19-17 at 9-10; ECF No. 19-14; ECF No. 20 at 4.  Gunn's shifting position is further reflected in Gunn's statements—at times insisting on timeclock punching but then elsewhere treating manual entries, with a supervisor's signature several days after the fact, as an acceptable alternative.  ECF No. 18-8 at 10–13; ECF No. 22-2 at 2; ECF No. 19-6 at 24.   Indeed, Gunn always signed Foster's timecards for payment, including through Foster's final weeks of employment at Summer Village.  ECF No. 22-1 at 49.  Accordingly, a genuine factual dispute remains as to whether timeclock punching, without exception, was an actual and legitimate expectation of Summer Village.  *See Hartman*, 2012 WL 3544730, at *16. In the light most favorable to her, Foster has provided sufficient evidence that her performance was satisfactory.

As to the fourth prong of the prima facie case, Summer Village next contends that its hiring of a black woman to replace Foster defeats this element.  ECF No. 18-1 at 15.  Summer Village is incorrect.  The Fourth Circuit has expressly held that in certain contexts, a "plaintiff

can make out a prima facie case without satisfying prong four." *Miles v. Dell*, 429 F.3d 480, 485 (2005). Specifically, "where the plaintiff can show that the firing and replacement hiring decisions were made by different decisionmakers, the plaintiff can make out a prima facie case without showing replacement by someone outside the protected class." *Id.*; *see also Lettieri v. Equant, Inc.*, 478 F.3d 640, 647 (2007) (affirming *Miles*).

The exception articulated in *Miles* applies here. It is undisputed that Gunn terminated Foster but did not choose her replacement. ECF No. 22-2 at 4. Under Summer Village's arrangement with a local temporary staffing agency, the agency would select and then send the temporary employee to Summer Village, including Foster's replacement, Laquita Brown. *Id.* Thus, the Court cannot conclude that Summer Village has defeated the prima facie case simply because Ms. Brown, too, is black. A reasonable factfinder could fairly conclude that Summer Village had nothing to do with this choice.

Because sufficient evidence permits Foster to establish the prima facie case, the Court next turns to Summer Village's claim that summary judgment is warranted because Foster refused to comply with its timecard policy. ECF No. 18-1 at 18; ECF No 18-8 at 12, 14; ECF No. 18-27; ECF No. 19-14. The question, therefore, is whether Foster has generated sufficient evidence that the ground for firing Foster was a pretext for discriminatory animus. *See Hicks*, 509 U.S. at 515 (plaintiff must show that the stated reason "was false, *and* that discrimination was the real reason."). When viewing the record evidence most favorably to Foster, a reasonable jury could find the stated ground illegitimate and that discriminatory animus motivated Gunn's decision to fire her. *See McDonnell Douglas*, 411 U.S. at 804–05; *Hartman*, 2012 WL 3544730, at *17.

To begin, Gunn's grounds for terminating Foster are a bit of a moving target. *See Dennis*

14

*v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 646–47 (4th Cir. 2002) (finding inconsistencies in an employer's stated reason for discharge may be probative of pretext); *see also Sears Roebuck*, 243 F.3d at 852–53.   Gunn testified in administrative proceedings that she issued the final corrective action to Foster on July 16, 2015 because Foster's timecard had missing entries for Monday, Tuesday, and Wednesday of that week.   ECF No. 18-8 at 11-13; *see also* ECF No. 18-22 at 9.   According to Gunn, this alone constituted a violation of the Summer Village handbook.   ECF No. 18-8 at 11-12 ("this was the reason she got the final writeup"); ECF No. 18-24.   But as Foster correctly points out, the policy says nothing about how soon after a missed entry an employee must obtain a supervisor's signature.   ECF No. 18-11 at 11.   Gunn also admitted that it would be fine for an employee to approach her supervisor several days later to obtain approval for missed entries.   ECF No 18-8 at 10.

Second, Gunn's stated reasons for terminating Foster do not square with the Summer Village written policy.   Gunn testified that Foster routinely violated the timecard policy because the handbook required her to obtain her supervisor's signature immediately after she missed a punch.   ECF No. 18-8 at 11-12; ECF No. 19-6 at 24; ECF No. 22-2 at 2.   But the handbook says nothing about needing a supervisor's signature for every single punch that is missed.   ECF No. 18-11 at 11.   Rather, it instructs employees generally to seek supervisor approval on "missed punches" before payment is made.   *Id.*   Tellingly, Gunn admitted that she always approved Foster's timecards and never once asked that Foster's paycheck be withheld.   ECF No. 22-2 at 3.

Third, Gunn characterized Foster's timecards as a "flagrant" disregard of the policy and as "jeopardizing" Summer Village's records.   ECF No. 18-8 at 12, 14.   Gunn now emphasizes that the timecard policy is meant to ensure that employees are actually working the hours they claim to be and that they are fairly compensated for their time.   *Id.* at 10, 12.   But in practice,

Gunn told Foster it was fine to obtain Gunn's written approval whenever Foster did not use the timeclock. *See* ECF No. 19-17 at 9–10; ECF No. 19-14; ECF No. 20 at 4.  Gunn also did not criticize Foster's punctuality or express concerns that Foster was misrepresenting the hours she had actually worked.

Fourth, while Summer Village now argues that its timecard policy is straightforward and unyielding—requiring use of the timeclock for every single punch and taking lunch every day (ECF No. 18-8 at 11-13; ECF No. 18-19)—Gunn's conduct belies this argument.  The record reflects that when Foster approached Gunn about missed punches, Gunn either encouraged Foster to write her time in manually or punted her questions to Proctor.  ECF No. 18-8 at 4; ECF No. 19-17 at 10, 14.  Proctor would then just refer Foster back to Gunn.  *Id.*  Gunn also conceded that, contrary to the handbook, Gunn told Foster she did not need to be off the clock when she did lunch runs for the entire office.  ECF No. 22-2 at 2; ECF No. 18-8 at 13.  In the light most favorable to Foster, a reasonable jury could view Gunn as a study in contrasts between her proffered reason for firing Foster and her conduct during Foster's employment.  *See Burdine*, 450 U.S. at 256.  This is enough to rebut the legitimacy of Summer Village's stated ground for termination.

In addition, Gunn's disturbing and racialized comments directed to Foster are probative evidence of her discriminatory animus.  *See Hartman*, 2012 WL 3544730 at *17 (explaining discriminatory remarks may be considered under *McDonnell Douglas* framework); *see also EEOC v. Enoch Pratt Free Library*, No. RDB–03–2727, 2005 WL 1712393, at *10 (D. Md. July 19, 2005).  Most damning, Gunn's words and gestures endorsed that she viewed *Foster* as an "office monkey."  ECF No. 20 at 2.  Gunn also called Summer Village minority residents and employees "inmates" and "ghetto."  *Id.*; ECF No. 18-18 at 1.  And Gunn referred to nonwhite

maintenance staff as "uneducated" and likely to "steal."[3]  ECF No. 20 at 2.  Moreover, Gunn expressed favoritism towards her white employees (ECF No. 19-17 at 13), and cycled through black temporary employees until the temp agency sent over a white employee who exhibited the "right temperament."  ECF No. 22-2 at 4; ECF No. 20 at 1-2.  On this record, a reasonable factfinder could conclude that Gunn's decision to terminate Foster was motivated by racial animus.  *See Enoch Pratt*, 2005 WL 1712393, at *10.

In sum, sufficient evidence permits a rational factfinder to conclude that Foster was terminated based on her race.  Summary judgment is therefore denied as to her discriminatory discharge claims.

**IV.        Retaliation**

Foster also contends that she was fired because she complained to Gunn about the "office monkey" and "ghetto" comments in late March 2015, and because she filed an EEOC complaint on July 22, 2015, the same day Gunn recommended Foster's termination.  ECF No. 19 at 14.  To establish a prima facie case of retaliation, Foster must demonstrate that: (1) she engaged in protected activity; (2) Summer Village took an adverse action against her; and (3) a causal link exists between the two.  *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018); *Brennan*, 361 F. Supp. 3d at 498 n.2; *Idris*, 2014 WL 5382633, at *3.

As to the first liability theory—Foster's reporting the racist remarks to Gunn—Foster argues this for the first time in her response.  ECF No. 19 at 14.  Instead, Foster pleads in her Complaint that the retaliation claims are based entirely on the EEOC complaint that she filed on the same day she was terminated.  ECF No. 6.  Plaintiff cannot amend her complaint and add

---

[3] Summer Village does not deny that Gunn made these statements, but instead advocates for a more charitable spin.  ECF No. 19-20 at 1; ECF No. 18-8 at 15-16.  To do as Summer Village urges would turn the summary judgment standard on its head.  It will be left to the trier of fact to weigh such arguments as to the proper context in which to view Gunn's statements.  *See Holland*, 487 F.3d at 213 (citations omitted).

new theories of relief at the summary judge stage.[4]  *See vonRosenberg v. Lawrence*, 849 F.3d 163, 166 n.1 (4th Cir. 2017) (quoting *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands*, LLC, 713 F.3d 175, 184 (4th Cir. 2013)); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (holding a "plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"); *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997).

Foster also contends that Summer Village retaliated against her for filing the July 22, 2015 EEOC complaint, the same day that Gunn prepared her termination letter.  ECF No. 19-17 at 15; ECF No. 19-16.  "To establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity."  *Gibson v. Marjack Co.*, 718 F. Supp. 2d 649, 655 (D. Md. 2010) (citing *Causey v. Balog*, 162 F.3d 795, 803–04 (4th Cir. 1998) ("[k]nowledge of a charge is essential to a retaliation claim"); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (explaining that "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.")).

No evidence reflects that Gunn knew of the EEOC complaint before she decided to fire Foster.  ECF No. 18-1 at 23-24.  To be sure, as Foster headed to the EEOC, she informed two coworkers that she was about to file the complaint.  ECF No. 20 at 4; ECF No. 18-8 at 7; ECF

---

[4] Alternatively, no evidence supports the inference that Foster's reporting Gunn's racist remarks in March alone gave rise to her dismissal four-and-a-half months later.  ECF Nos. 19-11 & 19-16; *see Strothers*, 895 F.3d at 335; *Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153, 165 (D. Md. 2000).  Although temporal proximity can be "sufficient to establish a causal connection at the prima facie stage," *Strothers*, 895 F.3d at 336–37, a "lapse of two months between the protected activity and the adverse action . . . weaken[s] significantly the inference of causation," *Horne v. Reznick Fedder & Silverman*, 154 F. App'x. 361, 364 (4th Cir. 2005) (per curiam) (quotation omitted).  This is especially so when considering that shortly after Foster complained in March, Gunn gave Foster a raise and favorably amended her evaluation.  ECF Nos. 18-20 & 18-21.

No. 19-17 at 16.  But nothing supports that either employee relayed this information to Gunn before she drafted Foster's termination letter.  *Id.*  Foster's vague assertions that at *some point* the coworkers told Gunn about the EEOC complaint certainly does not establish the timing of the disclosure.  ECF No. 18-8 at 7.  And Gunn, for her part, testified to having no knowledge of the EEOC complaint in advance of her decision.  ECF No. 18-8 at 15.  Thus, the dearth of evidence establishing a causal connection between Foster's termination and her EEOC complaint defeats the retaliation claims.  Summary judgment in Summer Village's favor is proper. [5]

### V.      Conclusion

For the foregoing reasons, Summer Village's motion for summary judgment is GRANTED in part and DENIED in part.  ECF No. 18.   A separate Order follows.

_____2/17/21_____                                    _____/s/_____
Date                                                                      Paula Xinis
                                                                              United States District Judge

---

[5] The Court rejects Summer Village's alternative argument that MCOHR's dismissal of the retaliation claims after a full hearing precludes this Court from reaching the same.  ECF No. 22 at 12; *see Rao v. Cty. of Fairfax*, 108 F.3d 42, 44-45 (4th Cir. 1997) (discussing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 470 n.7 (1982)).